IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LEARFIELD LICENSING PARTNERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>OCTANE5 INTERNATIONAL, LLC,<br><br>Defendant. | Civil Action No. 1:15-00607<br><br>Jury Trial Demanded |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Learfield Licensing Partners, LLC ("Learfield"), for its Complaint against Defendant Octane5 International, LLC ("Octane5"), alleges and states as follows:

**SUMMARY OF ACTION**

1. Learfield provides licensing services solutions to hundreds of colleges and universities across the country. Those colleges and universities and their licensees rely on Learfield to facilitate their business relationships by providing access to the relevant contracts, invoices, logo designs, and other information in a central location.

2. Octane5, one of Learfield's licensing software providers, provides the software platform that houses this data and provides services for over three hundred (300) colleges and universities and their licensees.

3. Learfield's agreement with Octane5 allows Learfield to terminate on ninety (90) days' notice and provides that Learfield will make quarterly payments of $75,000.

4. In March 2015, Learfield made the business decision to consolidate its licensing services from two service providers to one. Based on a report prepared by Deloitte, Learfield decided to terminate its agreement with Octane5 in favor of another software licensing service

1

provider. Accordingly, it gave Octane5 ninety (90) days' notice of termination and requested that Octane5 return a copy of its data to allow its selected vendor to begin incorporating the client information into its system.

5. Within days of receiving Learfield's notice of termination, on April 8, 2015, Octane5 sent a letter demanding that Learfield pay $225,000 for the current quarter (three times the contractual rate) within five (5) days or Octane5 would cut off access to its software platform. Loss of access to the system would have devastating consequences to Learfield, its clients, and their licensees, all of which rely on the system for their day-to-day business functions.

6. In addition, Octane5 has refused to return Learfield's client and licensee data to ensure an orderly transition to the selected software provider. Octane5's refusal to return this data threatens to delay the launch of the new system. According to Octane5's April 8, 2015 letter, any such delay that it causes should inure to its benefit by requiring Learfield to pay an additional $225,000 each quarter.

## THE PARTIES

7. Learfield is a Delaware limited liability company with its principal place of business and headquarters at 8900 Keystone Crossing, Suite 605, Indianapolis, Indiana 46204. Learfield's sole member is Learfield Communications, Inc., a Delaware corporation with its principal place of business in Missouri.

8. Octane5 is a Georgia limited liability company with its principal place of business and headquarters in Georgia. Upon information and belief, Octane5's members are Georgia citizens and are not citizens of Delaware or Missouri.

**JURISDICTION AND VENUE**

9. The Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and, upon information and belief, the controversy is between citizens of different states.

10. Venue in the Court is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim occurred in this district and Octane5 is subject to the Court's personal jurisdiction.

**FACTUAL BACKGROUND**

11. Learfield handles licensing on behalf of hundreds of colleges, universities, athletic conferences, and special properties nationwide. Its clients depend on Learfield to provide a full range of license management services, including royalty collection; accounting; trademark search and registration assistance; trademark enforcement and anti-counterfeiting services; and marketing, merchandising, and brand development services.

12. In 2014, Learfield Communications, Inc. acquired Strategic Marketing Affiliates, Inc. ("SMA") and Licensing Resource Group ("LRG"). Effective March 1, 2015, SMA merged into LRG, and LRG amended its name to Learfield Licensing Partners, LLP. SMA and LRG had historically used different third-party software platforms to provide their licensing services to clients and licensees.

*The Parties' Contractual Relationship and Development of the SMART System*

13. Beginning in 2014, SMA engaged Octane5 to provide its software platform. LRG had long used a platform called Trademarx to provide these services.

14. SMA's agreement with Octane5, to which Learfield succeeded in interest, was captured in a Letter of Intent dated May 15, 2014 and continued subsequently through the parties' verbal understandings and course of performance. The Letter of Intent provides that the initial term is to run from June 1, 2014 until June 30, 2017, provided that SMA may terminate "at any time upon 90 days' written notice to Octane5." The 90 day notice period was included to protect both parties. It gives Octane5 adequate notice but allows SMA to terminate in the event of performance or other issues. It also ensures that Octane5 will continue to provide services long enough for SMA to transition to a new provider.

15. The Letter of Intent further provides, in relevant part, that in 2015 and thereafter SMA would pay a "quarterly technology fee" of $75,000 by February 1, May 1, August 1, and November 1. Invoices for the quarterly technology fee are to be issued 30 days prior to the due date. After Octane5 executed the Letter of Intent, the parties verbally agreed to continue the arrangement at the same quarterly rate, with the quarterly payment to be due in the final month of each quarter..

16. In order to set up the Octane5 software platform, called the SMART system, SMA had to provide a substantial amount of critical client and licensee information to Octane5. That information is housed exclusively with Octane5. Learfield does not maintain the data itself, and the systems do not allow it to export all of the relevant information it would need to operate its business.

17. The SMART system serves as a one-stop resource for trademark and licensing information, and its ongoing functionality is critical to Learfield, its clients, and their licensees, who use the system on a day-to-day basis to manage their licensing relationships.

18. For example, licensees use the system to access all the details related to their licensing agreements, renew their contracts, and apply for new licenses. Licensees also submit all designs for review and approval, track the merchandise sold bearing client indicia, and report sales and royalties through the system. In addition, documents required by licensing agreements, such as certificates of insurance, are maintained in the system.

19. Clients likewise use the system to keep track of licensees, review and approve proposed designs, and track royalty data, among other things. Hundreds of colleges and universities would be affected if Octane5 were to suspend system services.

20. Learfield relies on the system for virtually every aspect of its business, including invoice details, payment information, royalty data, and other contract data. Its employees depend on the system for the everyday function of the business.

*Learfield Reevaluates Its Software Licensing Needs*

21. When Learfield Communications, Inc. acquired and eventually combined SMA and LRG under the same umbrella, it undertook to evaluate whether continuing to use separate providers for its licensing services made practical and economic sense. To that end, it engaged Deloitte to evaluate its current providers and to prepare a licensing solution assessment describing the various costs and features of the Octane5 and Trademarx platforms.

22. Based on Deloitte's report, Learfield made the initial assessment that for both financial and performance reasons it should transfer SMA's clients from the Octane5 platform to the Trademarx platform, although it did not make a final decision at that time. However, Learfield began to make plans for that transfer in March 2015.

*<u>Learfield Informs Octane5 It Is Likely to Terminate the Parties' Agreement</u>*

23. In mid-March, 2015, Learfield informed Octane5 that Learfield informed Octane5 that it had a propensity to want to work with Trademarx, but informed Octane5 that negotiations were still ongoing. At that time, Learfield requested copies of all of its client and licensee data. Octane5, despite acknowledging that it possessed backups of this data, refused to provide a copy to Learfield.

24. On March 19, 2015, Octane5 sent a letter to Learfield expressing disappointment with Learfield's decision and raising questions about the selection process. In its letter, Octane5 recognized the importance of the data to Learfield's ongoing business operations, noting that "the collection of data is the source of invaluable Actionable Information. The ability to track licensee activity down to the invoice level and generate information regarding channel and territory is critical to successfully managing the various college brands."

25. Consistent with the terms of the May 15, 2014, Letter of Intent, on March 31, 2015, Learfield notified Octane5 in writing that Learfield would cease using Octane5's services after June 30, 2015, if Learfield elected to use an alternative licensing software platform. Learfield conveyed its expectation that Octane5 would provide its data directly to Learfield or a designated third party upon request.

26. On April 3, 2015, Octane5 responded to Learfield's March 31, 2015 letter providing a revised proposal with a reduced fee for services.

*<u>Octane5 Threatens to Cut off Access to the SMART System Absent Immediate Payment of an Inflated Fee and Refuses to Return Learfield's Client Information</u>*

27. On April 8, 2015, Learfield confirmed to Octane5 that it would be transitioning all of its licensing software services to the Trademarx platform. In response, Octane5 sent a letter asserting that Learfield's rate had been raised from $75,000 per quarter to $225,000 per

6

quarter effective immediately and threatened to cut off access to the SMART system unless Learfield paid this inflated price within five (5) days. Specifically, Octane5 stated that it was shifting its program rates "to our short-term pricing model for a program of this size" and that its rates "beginning immediately will move to $75,000 per month with a quarterly commitment. All fees must be paid by the 15th of April to continue service."

28. The parties had never before discussed Octane5's "short-term" rates, and in fact the $75,000 quarterly fee had been agreed upon and continued based on Octane5's representations about its financial needs to provide quality services to Learfield, its clients, and their licensees.

29. Octane5's April 8, 2015 letter also refused to provide Learfield "copies of the data that we retain in our system" (i.e., Learfield's data) absent payment of an unspecified amount.

30. On April 10, 2015, Octane5 sent Learfield an invoice for $225,000 due April 15, 2015.

31. On April 10, 2015, Learfield sent Octane5 an unqualified demand to return its data, to withdraw the invoice for $225,000, and to provide assurances that it would not cut off Learfield's access to the SMART system.

### *Octane5's Conduct Threatens to Irreparably Harm Learfield*

32. Cutting off Learfield, its clients, and their licensees' access to the SMART system would cause irreparable harm. As set forth above, Learfield depends on the SMART system to run its business and meet all of its ongoing client licensing needs, to handle its invoicing, and to meet its contractual obligations to clients. Its hundreds of clients, most of which are public institutions, and licensees also depend on the system to run their day-to-day licensing operations, and losing access to the system would harm all of those third parties.

33. Octane5's continued refusal to return Learfield's data is causing irreparable harm, as Learfield needs to provide the data to its new software licensing service provider in order to make the transition in a timely manner and ensure it does not require Octane5's services after the June 30, 2015 termination date. Octane5 has offered no basis for its refusal to provide Learfield a copy of its own data.

## COUNT I
## BREACH OF CONTRACT

34. Learfield incorporates paragraphs 1 through 33 as if fully set forth herein.

35. Learfield and Octane5 entered into a Letter of Intent and subsequent oral agreement. Specifically, the parties agreed that the ninety (90) day notice obligation and the quarterly payment rates would remain at $75,000 payable in the final month of each quarter. The parties' course of performance reflected those terms.

36. Learfield has at all times performed its obligations under the parties' contract.

37. Octane5 breached the parties' contract by unilaterally increasing the quarterly payment amount from $75,000 to $225,000 and by threatening to cut off Learfield's access to the SMART system absent payment of that inflated rate within five (5) days.

38. Octane5's breaches of the parties' contract have damaged Learfield in an amount to be determined at trial.

39. In addition, Octane5's breaches of contract are causing and will cause Learfield irreparable harm warranting preliminary and permanent injunctive relief. Learfield is likely to succeed on the merits of its claim, the balance of the harms weigh in its favor, and the public interest would not be disserved by the entry of injunctive relief.

## COUNT II
## CRIME VICTIMS ACT

40. Learfield incorporates paragraphs 1 through 39 as if fully set forth herein.

41. Indiana Code § 34-24-3-1 (the "Crime Victims Act") authorizes any person who suffers a pecuniary loss as a result of a violation of Indiana Code § 35-43 to bring an action to recover its damages, treble damages, costs and attorneys' fees.

42. Octane5 has threatened to cut off Learfield's access to its critical client and licensee information, which is contained in Octane5's SMART system, absent payment of $225,000 on or before April 15, 2015. Octane5 has further refused to return Learfield's data absent a significant payment despite acknowledging that it has the capability to easily do so.

43. Octane5's threats and refusal to return Learfield's property constitute criminal conversion under Indiana Code § 35-43-4-3, as they constitute a knowing and intentional exercise of control over Learfield's property without authorization.

44. Octane5's control over Learfield's property is unauthorized because it has been exerted "in a manner or to an extent other than that to which [Learfield] has consented." Ind. Code § 43-4-1(b)(2). Specifically, Learfield has demanded the return of its data and Octane5 has refused to provide it.

45. Learfield has been injured and has suffered a pecuniary loss, and will suffer additional losses, as a result of Octane5's violations of Indiana criminal law.

46. Learfield, under the Crime Victims Act, is entitled to compensatory damages, treble damages, attorneys' fees, costs, actual travel expenses, reasonable compensation for lost time, and all reasonable costs of collection.

47. In addition, Octane5's criminal conversion is causing and will cause Learfield irreparable harm warranting preliminary and permanent injunctive relief. Learfield is likely to succeed on the merits of its claim, the balance of the harms weigh in its favor, and the public interest would not be disserved by the entry of injunctive relief.

## COUNT III
## COMMON LAW CONVERSION

48. Learfield incorporates paragraphs 1 through 47 as if fully set forth herein.

49. Octane5 has appropriated Learfield's property to its own use and benefit and in exclusion of Learfield's rights by claiming a right to payment of $225,000 and refusing to return Learfield's data absent payment of an extortionate sum.

50. Learfield made multiple unqualified demands for the return of its property, but Octane5 has refused to return it.

51. Octane5's exercise of unauthorized control over Learfield's property constitutes common law conversion.

52. In addition, Octane5's conversion is causing and will cause Learfield irreparable harm warranting preliminary and permanent injunctive relief.  Learfield is likely to succeed on the merits of its claim, the balance of the harms weigh in its favor, and the public interest would not be disserved by the entry of injunctive relief.

## COUNT IV
## PROMISSORY ESTOPPEL

53. Learfield incorporates paragraphs 1 through 52 as if fully set forth herein.

54. Octane5 agreed and promised to provide services subject to quarterly payments of $75,000 and to return Learfield's data upon request.

55. Learfield reasonably relied on Octane5's promise in providing its data and using Octane5's services for the past year to its detriment.  Learfield would not have used Octane5's services had it known that Octane5 would attempt to unilaterally increase the quarterly fee by a factor of three, threaten to cut off Learfield's access to the system, and refuse to return Learfield's client and licensee information.

56. Learfield was damaged by virtue of its reliance because it used and paid for Octane5's services in lieu of the services of another provider who would not attempt to extort payments that are not owed.

### PRAYER FOR RELIEF

WHEREFORE, Learfield respectfully requests that the Court (1) grant a preliminary and permanent injunction (a) requiring Octane5 to continue providing Learfield access to the SMART system until June 30, 2015, and (b) requiring Octane5 to immediately return Learfield's client and licensee data via a database backup or exports in an appropriate file format such as CSV or Microsoft Excel; (2) enter judgment in its favor on Counts I-IV of its Complaint; (3) award it compensatory damages; (4) award it treble damages; (5) award its attorneys' fees; (6) award its costs; (7) award actual travel expenses, reasonable compensation for lost time, and all reasonable costs of collection; (8) award prejudgment interest; and (9) enter all other just and proper relief.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

*/s/ Robert D. MacGill*_____
Robert D. MacGill (#9989-49)
Jessica M. Lindemann (#31058-49)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
E-mail: rmacgill@btlaw.com
jlindemann@btlaw.com

*Attorneys for Learfield Licensing Partners, LLC*